Good morning, Your Honors. May it please the Court, my name is Behnam Garagosly. I am from the Law Office of Ramin Gashgai, counsel for the petitioner, Mr. Ortiz. At this time, I would like to respectfully reserve three minutes for my rebuttal argument. Thank you. Your Honors, this case concerns itself principally with two main issues. First, whether it is abuse of discretion for an immigration judge to deny a motion to reopen based on irrelevant and misguided facts. And second, whether the Board of Immigration Appeals should show deference to this Court's holding in Menembo and Iturribarria. As to the first issue, the immigration judge in the incident case denied the petitioner's motion to reopen for three principal reasons. First, because there was no new asylum application attached to the motion to reopen. Second, because the immigration judge found that Lozado procedures were not followed. And third, that the immigration judge believed that there was no prejudice to the petitioner because of previous counsel's conduct. As to the first grounds, Your Honor, no new asylum application was attached because the asylum application was already a part of the record, as indicated in the administrative record, pages 186 to 21. You're talking about the original asylum application? Yes, Your Honor. That was wildly outdated by the time the I.J. ruled here, though, right? It was, Your Honor. However, there were no changed circumstances. So adding another asylum application to a motion to reopen would have been redundant. There's no change to change circumstances. Everything had changed, I thought. No, Your Honor. The basis of the petitioner's fear had not changed. It's not like the petitioner had gone back to his home country and experienced additional persecution. The reasons for his fear were the same. Normally, in immigration law, we attach applications to motions to reopen when there are changed circumstances. For example, when someone finds out that they are eligible for a new program that has come out, like NACARA or Deferred Action Program, it is then when they will attach a new application. But since it was already a part of the record, that was not necessary here. This is the application that was never ruled on? No, Your Honor. There was a 1995 I-589 asylum application, and then there was a motion to reopen in 1996 after the petitioner's now disbarred counsel decided to withdraw the I-589 without the petitioner's consent. Counsel, I'm sorry. Yes, Your Honor. So what was the original ground for the asylum application back in the 1990s? For various fears of violence in his home country, gangs, and so on and so forth. But it wasn't because of his political opinions? There were also – there also appears to be political opinions that were a basis of fear, Your Honor. That was because he was in the military. Well, Your Honor, the – with due respect, this is – the issue of this case is the motion to reopen. Yes, I understand. The merits of the asylum application should be reserved for whether or not this case is indeed reopened, rather than the – in other words, Your Honor, I feel as though – So what struck me about this case was the amount of time that transpired in his filing this current motion to reopen. Yes, Your Honor. For purposes of equitable tolling. Yes, I understand that. However, Your Honor, the – it should be noted that in 1996, there was a motion to reopen that was filed, and it was simply never adjudicated. I don't think that the failure of the immigration system to adjudicate the 1996 motion to reopen, which is what caused current counsel to file a 2007 motion to reopen, should be attributable to petitioner. That's the immigration system's fault. Do you think he had any obligation to inquire of anybody about the status of that motion? Well, Your Honor, he decided to get new counsel, and then he went ahead and filed another one when we – when – That was 11 years later, though, correct? It was, Your Honor. But – So let me – let me see if I get this – get the cast of characters straight. Yes. Mr. McGuire was the original attorney, right? Now disbarred attorney, yes, Your Honor. Well, last time – okay. Mr. McGuire was the attorney that represented him at the – his – he had retained McGuire's office to help him with his asylum application. That is correct. Right? And then we know from the transcript of that proceeding, McGuire didn't actually show up at the hearing. It was Mr. Alexander. Mr. Alexander showed up. And the hearing transcript reflects that Mr. – Ortiz. Mr. Ortiz was – somebody with his name was at the hearing. Yes, Your Honor. And here we find a disputed fact that was not appropriately adjudicated in either the immigration – before the immigration judge or the BIA. On page 34 of the record, we find a notice of entered appearance by Mr. Alexander that was not signed. Yeah. I thought that was kind of strange. Well, it's not strange, Your Honor. It's telling. It's telling that Mr. Ortiz was not present at the hearing, because if he was, he would have signed that – Well, wait, wait. The transcript clearly reflects that he was there, and the judge addressed questions to him, and he responded. I don't agree, Your Honor, because it seems as though someone was there who said, I'm Mr. Ortiz. But there's two facts that counter that. First, there's the unsigned notice of entered appearance, and the second one is my client's declaration under penalty of perjury saying that he was told not to show up and that he relied on his counsel's advice. Let me ask you this. Yes, Your Honor. With respect to the current motion, it was brought – I think it was brought to the IJ's attention that Mr. McGuire had been disbarred. Yes. Okay. And when you look at the State Bar's decision on his disbarment, one of the things that it points out is that his office engaged in these very kinds of activities. Yes, Your Honor. Which was fraudulently submitting applications and bringing in people, having somebody bring people in who really weren't the petitioners and whatnot. What he did was horrendous. Yes. I mean, terrible. But was that decision brought to the attention of the IJ who ruled on this current motion? Yes, Your Honor. It is in the motion to reopen in the record filed by present counsel in 2007. But unfortunately, if we look closely at the immigration judge's decision, it's hardly even addressed. The immigration judge, with due respect to that Court, simply glossed over and said, oh, well, you know what? We think that he was there. And because Lozada was not strictly complied with, I'm not going to reopen this case. I just, I mean, I guess I'm not sure that it's so unreasonable for the IJ to have relied upon the transcript, because I don't think your client ever said that some imposter had been sent in his place to the hearing, did he? Well, Your Honor, it's a reasonable inference, I feel, that if he's saying in his declaration in support of his motion to reopen, I wasn't there and they told me not to be there and I relied on it, then he wasn't there. But there was another hearing where that, in fact, occurred, right? I mean, that's why I was reading the record as suggesting that maybe he was getting confused with that earlier proceeding where he didn't show up. No, Your Honor. My client was not present at this hearing when the application, his asylum application was withdrawn, which brings me to the other point that Lozada does not need to be strictly complied with pursuant to this Court's holding in Rodriguez-Lariz v. INS when there is a clear and obvious ineffectiveness of assistance of counsel. Okay. Let's say we agree with you on that. But what about the finding of no prejudice? That seems like an obstacle as well. Your Honor, I think that the finding of no prejudice is very likely to be the most egregious error made by the courts below. My client hired Mr. Maguire's firm for one purpose, get me asylum. Instead, they told him, don't bother showing up. They sent an attorney that was not authorized to appear on his behalf, and they withdrew his claim. That, Your Honor, is a horrific example of incompetence and unethical assistance of counsel. I read the case law suggesting that it's not enough for you to show merely that your client lost the opportunity to have his asylum claim adjudicated, but rather that you've got to show that there was some likelihood he was actually going to get asylum had the claim been resolved. I understand that, Your Honor, but how are we going to know whether or not he was going to get asylum without him even having a chance to try to get asylum? It was a throne behind his back. I don't think he needs to make a showing that he's likely to prevail on his asylum app. I think it's a lesser standard than that. But what was his claim? That's what gets us back to where we started. What was his claim for asylum? His claim for asylum, Your Honor, was always based upon the fact that his country was dangerous and that he simply could not return. He didn't feel that he would be protected by the government there, given his political activities. And given the fact that he retained such a terrible firm, they didn't really supplement that asylum opportunity. By the way, what happened to Alexander? I meant to ask you. Also disbarred, Your Honor. He disbarred, too? He was actually disbarred because he was convicted of a felony of filing a fake tax return. We're not exactly talking about a dream team of lawyers here. All right. You wanted to save some time for rebuttal, so. Yes, Your Honor. And I apologize for that. Good morning, Your Honors. May it please the Court. My name is Juria Jones, and I represent the Respondent, the Attorney General. Good morning, Ms. Jones. Good morning. First, I want to address a couple of things. Petitioner ultimately is claiming that he wasn't at the 1995 hearing. But it is belied by the record that he was present. You saw from the transcript that he said, I was there. This is my attorney. Somebody claiming to be. But that's the whole point. He's not sitting there saying, here's my evidence that I was at a doctor's appointment, or here's my evidence that I was here, and someone's claiming. He's saying that I should now have my asylum application adjudicated some 12 years later. And there's two things. The fact of the matter is, just because the client didn't sign that form doesn't mean that that rebuts that he wasn't there. I mean, there is this presumption of regularity. You have the transcript. You have the I.J.'s decision. It's not usual practice, though, for them, when this happens at the hearing, for the I.J. not to have the applicant sign the form, is it? I'm talking about the appearance form from the attorney. That's what I'm talking about. But when Alexander shows up and submits the signed form, the client's signature is not on the form. No, but it's not. That's not common. Is that common practice? In 1995, perhaps. But it's not. If you look at the form, it's changed. But if you look at the form on page 121 of the record, it's not necessary for him to sign it. It's only necessary for him to sign it if he was a U.S. citizen or LPR. So his signature doesn't nullify the execution of this document. You have the transcript that's saying that Mr. Alexander was there. The I.J. was there. Mr. Ortiz was there. He withdrew his application. He specifically asked on page 87 of the record, your attorney advises the court that you do not wish to pursue your claim for asylum. Now, let me ask you this. So the I.J. didn't specifically find that, you know, he did submit a declaration that said I was told not to appear. That is what the declaration says, yes. Now, the I.J. didn't say that's inherently unbelievable. No. The I.J. said look at the record. Look at what we have. Let me ask you this. Is it reflected in the I.J.'s decision that he took a look at what happened at McGuire and McGuire's disbarment from the State Bar and that McGuire engaged in these kinds of activities? If you look at the I.J.'s decision, he does go into that, but he also talked about other reasons why to deny the motion to reopen. It's an untimely motion to reopen. Well, then he's asking for equitable tolling. Right. But the equitable tolling requires due diligence and prejudice. Right. And you've got a problem of due diligence here. Let me ask you this. He filed a motion for to reopen. It apparently was never adjudicated. Now, what's that all about? Well, it's a little deceiving to say he filed a motion to reopen with immigration court. His attorney at this time, a Mr. Rosenberg, filed a motion to reopen with INS, not with the immigration court. The motion is not signed, not signed by Mr. Ortiz, not signed by this attorney, and it's filed in the wrong place. So obviously, it's not going to be adjudicated by the immigration court. So to say that the immigration court didn't adjudicate this motion is a stretch. Was there anything in the file indicating that it was sent to the wrong place? Yes. Petitioner's counsel actually did a FOIA request. So if you look at the record, you can see from the record that there's a stamp on this There is no stamp that says because anything that's filed with immigration court or the VA has to be stamped. There is no stamp that says this was ever filed with immigration court. Is that the way the practice was back in? Yes. That's always been the practice. When was this? 1996. So if you look at the record on page 37. Hold on. Let me just. I'm sorry. Okay. You can see there's a stamp that says October 4, 1996, and it's Immigration Naturalization Service. Right. There is no stamp that indicates. So this was never filed with the immigration court. That's obvious from the record, but I don't understand how that. How does that hurt the petitioner? How was he supposed to know that the lawyer screwed up and didn't file the document in the right place? If assuming we go through the logic of saying he wasn't there. There's an issue of due diligence here. This was supposedly filed in 1996, and looking at his. He thought it had been filed and was waiting to find out, well, what's going to be. That's 11 years of not adjudicating, which tends to undermine the due diligence argument. I mean, if you take what he's saying in his declaration in 1996 that wasn't signed, that he was told not to show up, he was fully aware of what was happening, and yet it took him until 2006 to file a motion to reopen. So that's where the board and the immigration judge is going to say, look, you've got all this weighing against you. But then at the end of the day, where's your due diligence? Where's your prejudice? And in particular, looking at his new declaration that he did sign and execute it, he even admitted in the declaration that things have changed in Guatemala. His first asylum application was based on a political opinion. He says in his declaration now, things have changed, things have quieted down, and now I'm afraid of gangs. Well, when we try to assess prejudice, are we trying to figure out whether his original asylum application would likely have been or maybe not likely, but there's some probability it would have been granted, or are we trying to figure out whether he would get asylum today? The prejudice argument goes with the due diligence with regards to equitable tolling, of whether or not he was prejudiced by the fact of the fraud that allegedly occurred. But that argument goes to the requirement for a new application with his motion to reopen. The fact of the matter is he was well aware that that whatever happened in 1995-96 was no longer in play at a court. He was very aware, assuming, again, that his declaration was true in 1996. But why does – if I understood your answer correctly, you're saying we have to look at the situation back in 1995 and assess whether he had asserted grounds that would have entitled him to asylum then. So why does it matter now that things have changed today? I guess I'm confused by your question because the question is there's the due diligence argument, but then there's the prejudice that goes with it. Right. And the fact of the matter, on top of that, there's a requirement for a new application for a motion to reopen. The fact you have an untimely motion to reopen, you have to file a new application because he's not asking for the old application to be reinstated. His own words is saying that he's not asking for it to be reinstated. So that's all part of why there's multiple reasons why both the IJ and the board found that there is no reason to reopen these proceedings because he was there. Assuming that he wasn't there, there is no due diligence. And where's the prejudice? Because he himself is saying things have changed. I don't no longer have that claim anymore. I've got a brand-new claim now. So on top of all that, in an untimely motion to reopen that was filed 12 years after this alleged incident happened, you don't have – you don't meet the requirements to have a motion to reopen – to be reopened. You don't meet those requirements to have a successful motion. But, you know, what happened here doesn't – it doesn't give one much comfort. I mean, these lawyers were just incredible. I don't want to disparage another attorney, but I mean – Well, he was disbarred by the California bar with a list of horrendous – horrendous conduct. I don't want to disparage another attorney. You don't want to disparage him? He was disbarred in – The state bar disbarred him. The other guy's convicted in federal court or state court. I'm sorry. For tax reasons. And this – he was disbarred in – Bunch of fraudsters. He was disbarred in 2007, and this was in 1995. Now, I'm not saying that he's always been the stellar attorney, but it's – it would be unfair for me to impugn upon him – Look, we – this court and the board had a terrible time with these lawyers. They were rampant, and they did a lot of damage to a lot of people. And it took a lot of effort by the court, the U.S. Attorney's Office, the board, trying to get a handle on these guys that were just ripping off people. Something terrible. And it's reflected in that report, the disbarment of Mr. McGuire. And what happened here is very similar to the circumstances that led to Mr. McGuire's disbarment. Right. And I also pull the record as well. But beside that point, though, you have a remedy that he – Why didn't you put in? But there was a remedy for him. File a new application. Let that be the basis for it. You can't sit there and say, I wasn't there. I had bad attorneys. You knew – if you knew you had a bad attorney, you knew that he withdrew the application. File a new application. There were remedies that he had that he didn't do. There are procedures that are in place that he didn't follow. And so for the court to look back now, this is an abuse of discretion. Did the IG report – Let me – you said that that motion to reopen that was filed in 1996 was filed with the service. So it says – you're right. It does say – I didn't catch the subtlety of that when I looked at this. But it says United States Immigration and Naturalization Service. Records? Is that what it is? Right. U.S. – I don't know. Los Angeles Records? And what's the other – what's the other stamp? It says District Counsel. There was – so there was the INS, and then there's INS Counsel's Office. I wasn't working there at the time, so this is – looking at the Certificate of Service, if you look at page 42, you see there is two places where he served, one on room 7621 on the eighth floor. So those two stamps to me reflect one was INS's Counsel's Office and one was INS's Office. That's my interpretation. That's the way the record reads to me. But the bigger picture is there's no record that this was ever filed with Immigration Court. And if you read through Petitioner's brief, he somewhat acknowledges that. He says, well, you know, it wasn't adjudicated, but yet he filed it with INS. I mean, Immigration Court can't adjudicate something like that. Was the court at that time located in the same building as the INS office? That I do not know the answer. I would have to go back and look through the records to figure out where the Immigration Court was located at the time. I don't know the answer to that one. I see my time is up. Does anyone have any other questions? Okay. Thank you, Your Honor. Thank you, Counsel. I appreciate your argument. Good morning again, Your Honors. Just really quickly, if we look at page 121 of the record where this notice of entry of appearance exists, it asks for name of person consenting. This is to provide safeguards that if an attorney is appearing for an alien, for these immigrants who are particularly susceptible to fraud, as we can see in the records, they are consenting to this person. We don't have that here. And therefore, this person, Mr. Alexander, was not authorized to speak or withdraw this I-589 application. I see that my time is up. Okay. Thank you. Yes. Thank you. Thank you, Your Honor. We appreciate arguments on both sides, and the matter is submitted. We'll go back to the – I believe Mr. Fong is here. Yes. Yes. We'll go back to number one on the calendar, which was Gin v. Holder. Good morning, Your Honor. Good morning, Mr. Fong. May it please the Court, my name is Daniel Fong. I represent the Petitioner. Can you keep your voice up? Yes. Your Honor, in this case, the I.J. failed to give a specific and cogent reason for his disbelief of the Petitioner's testimony. Well, he certainly gave a specific reason. I mean, you can argue whether it was cogent or not, but he – I mean, he gave a fairly elaborate explanation for why he didn't find your client credible. But, Your Honor, he did not – he did not explain why, because of this discrepancy, my client was not believable. He simply said – the I.J. simply says, I don't buy it. I don't find it believable. Well, he found it implausible that he had this one particular medical record, but claimed that he couldn't locate any of the others. Right. But he – yeah, but the I.J. did not explain the significance of the alleged discrepancy. And my client gave a plausible explanation. He forgot about it. He had a headache. He forgot about it. So he explained his discrepancy in the – on the record, my client. But the I.J. didn't – he didn't believe him. He said he – in part because of his demeanor, he had this big smile on his face when he claimed that he forgot and he had a headache, and then proceeded to give an implausible explanation. He said an explanation that the I.J. found implausible. Right. Your Honor, but the I.J. did not address my client's explanation. He did not say why my – why my client's explanation was not believable. He simply said – he simply said, I don't find it plausible. Your Honor, according to this Court's case law, the I.J. or the BIA must explain the significance of the discrepancy. For instance, in Singh v. INS 263, factor 1164, this Court reversed the BIA credibility determination when it failed to clarify why the purported discrepancy was significant. And – Mr. Feng, what do you understand – I mean, I read the I.J.'s decision several times because I'm trying to figure out what he was saying. What do you understand him to say or explain why he found Mr. Jin not credible? Why did the I.J. find the – Yeah. How do you read his decision? What – what – what – I think, Your Honor, that's a – From your perspective. One could reasonably interpret it the way Judge Watford did. Your Honor, I think the decision was not very easy to read. He just kind of – he just went rambling on the record, Your Honor, the I.J. And he just simply regurgitated what my client said on the record, and then he said, I don't find this guy believable. I don't find him to be plausible. I don't find the explanation to be plausible. But he did not explain why that was not plausible. I thought he – one thing – one way to look at it is that he said that – he made the comments about how Mr. Jin had traveled in many countries and a very elaborately planned trip, and, you know, he comes to court and they ask him about medical records, and he says he doesn't have any. And then the counsel for the government says, What about this medical record – medical document that's in the record? And he says, oh, I forgot it. Oh, I had it in my pocket. Yes. It's – our position is that it's entirely possible for him to have his medical record in his pocket. And the I.J. says in response, well, I find that implausible. I don't believe that because you had this elaborate trip. You must have – you must have known you had it. But, yeah, the I.J. might have found it implausible, but he did not explain why he believed that that was implausible, Your Honor. Yeah. And – yes, also, Your Honor, it's not enough for the I.J. to say that it is not implausible. If the I.J. failed to give a specific and cogent reason, the negative credibility determination must not be upheld, Your Honor. Okay. You want to stay the rest of your time for rebuttal? Yes. Good morning. This is a post-Real ID Act case. So, in particular, contrary to what Petitioner's counsel stated, the immigration judge and the board gave a very reasoned explanation of why Petitioner was found not to be credible. In particular, looking at the I.J.'s decision on page 31 and 32, the I.J. discussed the fact that when Petitioner first was asked about medical records, he first said he couldn't get medical records. Then he said he called his wife and tried to get medical records. She couldn't find them. Then when he was confronted with the fact that he had the medical records and they were attached to the asylum application that had been previously admitted to USAS, the immigration judge noted that he had a big smile on his face and said, oh, I have a headache. Then he said he didn't. Then he said he forgot. Then he said that the hospital records were from May. And then he was confronted with the fact that the hospital records are dated April. And then he said, oh, I had them with me. I don't know why I brought them with me, but I had them with me in my pocket as I traveled through four continents. So looking at the entire story that Petitioner gave while testifying, it was very reasonable and should be afforded deference that the fact that Mr. Jen was found not to be credible. He was provided an opportunity to explain this, and his explanation was unpersuasive. Well, he said it pertained to another event. It wasn't the event where he was beat up. But that doesn't explain why it was part of his asylum application that was being adjudicated because of his alleged detention that happened in China. That's not what the IJ said, though, is it? No, but that's part of the question. I've read this thing. I don't know how many times I've read these very same paragraphs that you're talking about, and you can interpret them in different ways. But looking at the Board's decision, the Board clarifies this is what we're doing. The credibility was placed in question, particularly with regards to this hospital record, and particularly with regards to the fact that first he said he couldn't find them, and then he said, oh, yeah, by the way, they're there. I got a big smile on my face. And, oh, I forgot. Oh, I have a headache. I mean, all of that felt in place. But did they say that his explanation, that this particular record pertained to another event, was just that they didn't believe that? But it didn't make any sense because his explanation contradicted the record itself. I mean, this was corroborating evidence that he provided. And his explanation was this was from May, and the document dated April. So his own explanation proves to be unpersuasive because it contradicts what the document says itself. Didn't he even correct himself with respect to those dates during the course of the hearing? He later made what the IJ characterized were unresponsive remarks, but he never really quite clarified exactly why he was referring to an incident that happened in May when the document was dated April. And then government's counsel went on to another line of questioning at that point. But that proves the point is that he was offered an opportunity to provide an explanation, and his own explanation of his own corroborating evidence was unpersuasive. So there is substantial evidence to show that there was no, that the average credibility determination was reasonable in light of all of this. And so with that not being the dispositive argument that the board adopted. Didn't he have other documents that he also submitted as well? He had, I believe, some work documents, not work documents, but a notary registration that was submitted in 06, I believe, that just was, as his attorney said, was background information just about identity. Did he have those documents with him when he was traveling around the world? There wasn't a question on that. I believe those documents were, I don't know. That's actually a good question. I don't think that was actually explored in the record because those documents were provided as background information of, you know, here's my, you know, identification documents from China. I believe they were dated 2006, but I don't know whether or not he got those documents after he arrived in the U.S. or before he left. And I don't think that ever was explored either by government's counsel or by his counsel. So I don't know the answer to that question. Didn't he testify that he had a bag with him when he was traveling? He said he had a small bag with him. That's correct. But he didn't provide what was in that bag. And then part of that whole discussion about hospital records is that he actually didn't carry this in his bag. He actually carried this in his pocket. So that was part of the immigration judge saying, you know, four different continents. I mean, he went through multiple places in nine days, and yet he carried this in his pocket, and yet after being shown the document, admitted that that was the document that was his, he had forgotten about the document. So that all goes to the plausibility of the story. Well, can I, I just want to make sure I understand the rationale for why this problem with his credibility on this point matters. Is it because he was claiming in this other incident to have suffered some kind of physical abuse, and the IJ was saying, well, I'd like some corroboration of that, and the petitioner was trying to explain why he didn't have any? Is that? No. What was, this was, the question of the hospital records came on cross-examination. Again, this instance is a post-real ID. This didn't really have to go to the heart of his claim. No, no, I understand. So in question, so when government's counsel got up to question, they said, do you have any hospital records? And he said, no. And so then after further questioning, government's counsel said, well, why did you submit this hospital record with your asylum application? And so that's how the whole hospital record sort of transgressed. It wasn't a fact of. But so is the notion that his inability to bring forward cooperation was just, I mean, his explanation was, I tried, I had my wife try, I couldn't get them. The theory is that, well, the IJ just found that explanation for the inability to get cooperating evidence implausible? No, the explanation is that when he first stated that he tried, he couldn't get the records. Then the matter of the fact, he had the records. They were submitted as part of his asylum application. But they related to a different incident. That's what I'm saying. They didn't relate to the incident that's in question, right? We don't know the answer to that question because when he was questioned about it, he said it was an incident that happened in May. He was detained and allegedly beaten in January of that year. This hospital record is dated April, and yet his testimony is saying this is about an incident that happened in May. But in any event, it's a different incident from the one that he was being questioned about. But I agree with you, Your Honor, but this is his document. He provided this document to the court. He's the one providing cooperating evidence. He's saying that, look, I can't remember what the nature of the abuse was, but back in January, I had this thing happen to me. It would rise to the level of persecution if you believe me. And I.J., I guess, was wanting to see some cooperation. He says, look, I couldn't get records for that particular incident. And they point out, well, you do have a record for this other thing. And he says, well, yeah, I happen to have it with me. That's not quite exactly how it played out because in his testimony, he never mentioned that he went to a hospital. So there wasn't a question of cooperation because in his testimony, he said, I was beaten, they hit me, I got sick, they were afraid I was going to die, so my wife paid a bond and I was released. Only on cross-examination when he was asked about hospital records, then it became evident that he had no idea what he had submitted to corroborate his own claim. And that's where the credibility, his credibility unraveled. And that's exactly what the board said. That's the question of where everything unraveled is that you have this elaborate story, you've submitted this hospital record as part of your asylum application, and yet you have no idea what it is. When you're confronted with it, you say, oh, yeah, that's mine. You have a big smile on your face. And this court has said repeatedly, you know, immigration judges being actually in the courtroom able to see the demeanor of an applicant. But that's not why he denied it. Yeah, that's not why he found him not credible. That's part of the reason. I mean, the immigration judge noted at page 32 that the applicant had a big smile on his face and then said, oh, I have a headache. Then he was questioned, do you have a headache now? Oh, no, it went away. And then it went on and on and on. And therefore, he didn't say, I therefore find him not credible because he was smiling in court? No, but that's part of what. I mean, that goes to the bigger part of the analysis. That's part of the. I don't know. When I read this statement, he says that, you know, if you read it here on page 5 of the IJ's decision, I mean, it just doesn't make any sense. I can't make sense out of it. The immigration judge's decision probably is not the most artfully written decision. Thank you. But the gist of it and what the board admitted and what the board stated was that his credibility was placed in question. And he was clearly aware of that fact. If you want to have any questions, thank you. Thank you, Ms. Jones. Your Honor, may I begin now? Your Honor, I. Mr. Fang. Yes. Just as the. Okay. Our client. He. Okay. When confronted with the alleged discrepancy, my client gave a possible explanation. He said he had a headache. He forgot about the medical document. And the IJ never addressed why his explanation was not possible. He never addressed why his explanation was not believable. So I think we have to infer from the IJ's decision that that was not believable. But the IJ never explained it, Your Honor. And also, even if he were in consistency, it cannot be viewed as an attempt by the petitioner to enhance his credibility. So it has no bearing on his credibility, this alleged discrepancy. Well, I mean, what he said was the respondent was asked why he brought them, meaning the record. And he did not say to substantiate a potential claim. He did not say for some potential reason, I may need them, some medical reason, some legal reason. All he said was, oh, I had them in my pocket. And the IJ says, I do not find that to be plausible. Your Honor, but he was not asked, my client was not asked why he brought those documents into the United States. He was not asked that question. And also, the government arguments argue in his brief that the petitioner changing testimony reflected a measure of orchestration which negates the authenticity of the medical record. We disagree with the government's arguments. Because if it were a measure of orchestration, it would not have made sense for my client to say he forgot about the medical document and clarified his testimony. My client's testimony has nothing to do with the authenticity of the medical document. So my client's explanation cannot be viewed as an attempt to enhance his credibility, nor can it cast doubt on the authenticity of the medical document, Your Honor. Okay. Thank you. Thank you, counsel. We appreciate your arguments. Ms. Jones, have a safe trip back to D.C.
judges: Conlon, Paez, Watford